Filed 2/28/14  In re V.A. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re V.A. et al., Persons Coming Under the Juvenile Court Law. | D064361 |
| _____ | |
| SAN DIEGO HEALTH AND HUMAN SERVICES AGENCY, | (Super. Ct. No. SJ12583A-B) |
| Plaintiff and Respondent | |
| v. | |
| V.A. et al., | |
| Defendants and Appellants, | |

APPEAL from orders of the Superior Court of San Diego County, Cynthia Bashant, Judge.  Orders affirmed.

Elizabeth C. Alexander, under appointment by the Court of Appeal for Defendant and Appellant V.A.

Jamie A. Moran, under appointment by the Court of Appeal for Defendant and Appellant M.C.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy, Paula J. Roach, Senior Deputy, for Plaintiff and Respondent.

Suzanne F. Evans, under appointment by the Court of Appeal for Minors.

V.A. (Father) and M.C. (Mother) appeal from orders denying their respective petitions to modify a previous order and terminating their parental rights under Welfare and Institutions Code section 366.26 to their daughter V.A. (All undesignated statutory references are to this code.) They contend the juvenile court abused its discretion when it denied their section 388 petitions requesting that V.A. be returned to the care of one of them. Alternatively, they assert the juvenile court erred when it declined to find that the beneficial relationship exception of section 366.26, subdivision (c)(1)(B)(i) applied to their relationship with V.A.

Mother also appeals from an order denying her petition to modify a previous order and terminating her parental rights to her older daughter V.C. She contends the court erred when it denied her petition requesting that V.C. be returned to her care. She alternatively asserts the juvenile court erred when it declined to find that the beneficial relationship exception applied to her relationship with V.C. We affirm the orders.

GENERAL FACTUAL AND PROCEDURAL BACKGROUND

Father and Mother had an "on and off" relationship for about five years. They are the parents of V.A. (born 2010). Mother has six additional children from separate fathers, including V.C. (born 2001) and N.M. (born 2003 or 2004). V.A. and V.C. (together, the minors) lived with Father and Mother. N.M. lives with his father, Ray, and Mother's remaining children live with relatives in Mexico.

In early June 2011, the San Diego County Health and Human Services Agency (the Agency) filed dependency petitions under section 300 on behalf of then 11-month-old V.A. and nine-year-old V.C. based on Mother's depression and suicidal ideation,

Father's physical abuse of V.A., and his emotional abuse of V.C. V.A. and V.C. were detained together in the same foster home where they remain today. The following month, the juvenile court made true findings on the Agency's petition. It ordered the minors removed from their parents' custody and placed in foster care, and reunification services for Father and Mother.

In December 2011, Father suffered a stroke and his physical health began to deteriorate. At the six-month review hearing in February 2012, the juvenile court found return of the minors to their parents would create a substantial risk of detriment. It also ordered an additional six months of services for Father and Mother, who were living apart. Although Mother had progressed to unsupervised visits with the minors, this privilege was revoked after she allowed N.M. and Ray to have contact with the minors. In July 2012, N.M. became a dependent of the juvenile court and was placed in foster care after Ray was arrested for charges of lewd and lascivious acts with a child under 14 years of age.

At the 12-month permanency hearing in July 2012, the Agency recommended termination of reunification services. The juvenile court continued the minors as dependents in foster care and continued reunification services to the 18-month date. At the contested 18-month review hearing in February 2013, the juvenile court followed the recommendations of the social worker, terminated reunification services for both parents and set a section 366.26 hearing.

Father filed a section 388 petition requesting that the juvenile court return V.A. to his care. Mother also filed a section 388 petition as to both minors. The juvenile court found both petitions met the prima facie test and the evidentiary portion was consolidated with the contested section 366.26 hearing. At the July 2013, contested section 388 and section 366.26 hearings, the juvenile court denied the section 388 petitions, found both minors adoptable and determined that none of the exceptions to adoption under section 366.26 (c)(1)(B) applied. It terminated parental rights and ordered a permanent plan of adoption for the minors. Both parents appealed.

DISCUSSION

I. *Section 388 Petitions*

A. General Legal Principles

Section 388 serves as "an 'escape mechanism' when parents complete a reformation in the short, final period after the termination of reunification services but before the actual termination of parental rights." (*In re Kimberly F*. (1997) 56 Cal.App.4th 519, 528, citing *In re Marilyn H*. (1993) 5 Cal.4th 295, 309.) Under this statute, a parent may petition the court to change, modify, or set aside a previous court order on the grounds of changed circumstances. (§ 388, subd. (a).) The parent must show both a change of circumstances and that the modification would promote the child's best interests. (*In re Casey D*. (1999) 70 Cal.App.4th 38, 47.)

In considering a request for a change of placement at the permanency planning stage, the juvenile court must recognize that the focus has shifted to the child's need for permanency and stability. (*In re Stephanie M*. (1994) 7 Cal.4th 295, 317.) On appeal,

4

the juvenile court's ruling will not be disturbed absent a clear abuse of discretion. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415-416.) The "scope of discretion always resides in the particular law being applied, i.e., in the 'legal principles governing the subject of [the] action . . . ." (*City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297.) A judicial determination that falls outside the applicable principles of law constitutes an abuse of discretion. (*Nickolas F. v. Superior Court* (2006) 144 Cal.App.4th 92, 119.)

B. Mother's Appeal

In denying Mother's section 388 petition, the juvenile court found that the circumstances were similar to those that existed at the 18-month review date. It noted that while Mother had participated in domestic violence counseling and therapy, she was unable to put her children first and do what was best for them. It found that Mother was still not in a position to take care of the minors and protect them. Mother contends the juvenile court abused its discretion because she had made great progress in eliminating protective issues and her poverty should not be a factor in keeping her from her children.

In support of her petition, Mother noted that she had employment, stable housing, had completed 12 weeks of domestic violence support group work and participated in individual therapy to, among other things, identify red flags associated with physical or emotional abuse and increase her empathy and sensitivity to her children's situation. As we shall explain, Mother has shown that her circumstances were changing, not that they had changed within the meaning of section 388. Even assuming Mother had shown changed circumstances, she did not meet her burden of showing it would be in the minors' best interests to be returned to her custody.

Mother has a long history of abusive relationships. While a teenager, she married a man who physically abused her. When separated from her husband, she had a relationship with another man who mistreated her children and humiliated her. After leaving that relationship, she became involved with V.C.'s father, a man who also physically abused her. When V.C. was a year old, Mother became involved with Ray, a man who physically abused her and V.C. She then became involved with Father. Mother stated that Father was very controlling and humiliated her. Father would tie N.M. to a chair if he cried and spanked V.A. when she cried.

Review of Mother's child welfare history reveals a number of referrals to Child Protective Services dating back to 2003. V.C. suffered physical abuse from Ray and Mother's sister in two substantiated referrals. During about an eight year time period, Mother stayed in domestic violence shelters four times. Mother's current therapist described her situation as typical of those victimized by domestic violence, including low self esteem and becoming overly dependent on partners for economic and emotional support.

By the time of the six-month review hearing in January 2012, Mother had completed parenting classes, attended a domestic violence support group, and was in individual counseling. A few months later, however, Mother allowed N.M. and Ray to have unauthorized contact with the minors. V.C. reported feeling fearful and anxious during the visits because Ray scolded N.M. and once hit him hard with a ball. Mother continued to allow Ray to attend visits even after being told not to do so. When a social

worker explained to Mother that she had not put the needs of her children ahead of her own, she did not take responsibility for her poor judgment.

Although Mother completed her parenting classes before the six-month hearing, she still had inappropriate interactions with her children before the 12-month review hearing. During one visit, Mother scolded V.C. causing her to cry. She later told the minors that Father was right when he punished the minors and in the way he disciplined V.C. and N.M. because otherwise they would do whatever they wanted. In February or March 2013, Mother's therapist closed her case in part based on Mother's " 'lack of motivation.' " At the request of a social worker, Mother resumed therapy with a new therapist as this was part of her reunification services for her open case with N.M.

At trial, Mother's new therapist explained that Mother initially had difficulty expressing empathy toward the minors, but in the last four or five sessions she had shown improvement. He considered Mother's level of empathy to be appropriate. As of May 2013, the minors' Court Appointed Special Advocate (CASA) had continuing concerns regarding whether Mother could "satisfy the [minors'] emotional needs, protect them or be honest. The social worker similarly expressed concern that Mother "has continued to demonstrate inability to be protective of V.C.'s emotional well being." She relayed an incident that occurred in June 2013 wherein Mother discussed adoption with V.C. that resulted in V.C. crying for two hours after the visit. When told of this incident at trial, Mother's current therapist agreed that Mother would not be displaying empathy toward the child if the incident occurred as described.

7

Although Mother initially had unsupervised visitation, the visits reverted to supervised when she allowed Ray to attend some of her visits with the minors, even after the social worker had warned her about this. As late as January 2013, a social worker saw Mother in a car with Father, a fact Mother initially denied, but later admitted. The social worker concluded that "despite all the services provided, [Mother] has not been able to develop the necessary insight into the protective issues and her children's emotional needs so that she can demonstrate that she can keep her children safe."

During trial, Mother stated that she allowed the contact with Ray, knowing it was not okay, but claiming it was the only way she could see N.M. This testimony is concerning as it shows Mother's inability to utilize what she has learned. She allowed Ray to control the situation and placed the minors in harm's way, rather than seeking alternative solutions. Indeed, in addressing Mother's section 388 petition, the social worker opined that the individual therapy and domestic violence support group classes that Mother participated in "have not assisted her to completely overcome her 20-year history of chronic involvement in abusive relationships. . . ." The social worker concluded that Mother's domestic violence and mental health issues remained unresolved and that she was not prepared to have the minors placed with her.

Even more concerning is Mother's lack of honesty. At trial, Mother claimed she was unaware that Ray could not have contact with the minors and denied knowing that Ray had been arrested for molesting his granddaughter when he had accompanied her for visits with the minors. This testimony contradicts earlier reports from the CASA that Mother admitted to the foster mother that she knew Ray had moved to San Diego to

8

evade police capture on child molestation charges in another county. The social worker and CASA similarly reported that Mother had been warned about allowing Ray to have contact with the minors.

On this record, we cannot conclude that the juvenile court abused its discretion in finding that Mother had not shown changed circumstances. Even if Mother had sufficiently demonstrated changed circumstances, she did not meet her burden of showing it would be in the minors' best interests to be returned to her custody.

The California Supreme Court has described "the goal of assuring stability and continuity" as a "primary consideration in determining the child's best interest[s]." (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317.) In support of her best interests claim, Mother argued it was undisputed that V.C. loved and missed her, wanted to be returned to her and wanted V.A. to be with them. The minors' love and affection toward Mother, however, do not outweigh all other factors in determining their best interests.

Mother has a long history of involvement in abusive relationships, these proceedings have been pending for over 18 months and V.A. was only 11 months old when she was initially detained. The social worker opined that while the minors enjoyed visiting with Mother, they were not upset when the visits ended. She noted that for the last two years, the minors "have been getting their daily physical and emotional needs met by their current caregivers who have expressed their commitment to adopt them." The juvenile court reasonably concluded that Mother could not provide the minors with the stability and permanency that they needed and deserved. Accordingly, we find that

the juvenile court acted well within its discretion by denying Mother's section 388 petition for modification.

C. Father's Appeal

Father contends the juvenile court abused its discretion when it denied his section 388 petition because he established a parent-child bond with V.A. and showed that he had turned his life around, with full involvement and successful completion of services. We are not persuaded.

V.A. was removed from Mother and Father's care, in part, based on Father's excessive discipline. Father tied N.M. to a chair if he cried, slapped V.A.'s face and sent V.C. to bed without dinner. Although Father expressed remorse for his actions, he also rationalized his harsh discipline practices. Father reported that he had been treated for depression and had experienced suicidal thoughts in the past. Father had weekly, supervised visitation with V.A. He also attended weekly therapy. Father's therapist reported that Father had a history of unresolved childhood trauma and neglect, with limited insight as to how these issues affected his functioning. Father showed a lack of understanding of children's needs and an inability to show empathy due to his own difficult childhood.

In December 2011, Father suffered a stroke. Although Father attended therapy and completed parenting classes, the Agency maintained supervised visitation because it could not assess Father's readiness for unsupervised visitation due to his failure to stay in touch with the Agency. In January 2012, Father started attending a 52-week domestic violence treatment group. In July 2012, the therapist reported Father's progress as

10

"marginal," he rarely participated and showed little insight into his child's needs. By July 2012, Father had made "some progress" in his domestic violence treatment, but still lacked in the areas of skill development, empathy, insight, and parenting.

Before the 18-month review hearing in February 2013, the Agency reported that it was unable to contact Father. The foster parents noted that Father has not called to request additional visit or updates on V.A.'s well being. At the 18-month review hearing, Father testified that he learned in his parenting class about caring for a young child and that he needed to stress good things, not bad things. Father had completed 42 weeks of his 52 week domestic violence treatment group. He expressed sorrow for exposing V.A. to domestic violence and claimed it would never happen again.

The social worker testified that she believed it would be detrimental to return V.A. to Father's care because Father had not accepted full responsibility for what occurred and could not articulate a safety plan to guard against domestic violence. She explained that when she spoke to Father a month earlier about what had happened at the start of the case, that Father "continued to minimize the situation," claiming nothing had happened and that he had not done anything.

The social worker testified that a two-year old child such as V.A. was very dependent on adults, could be frustrating and that Father was not ready to parent her full time. Although Father planned to live with an adult child that could help care for V.A., the social worker expressed concern that the Agency had not been able to evaluate the home and that V.A. did not have a relationship with this person. The social worker also believed that V.A. was not emotionally ready to be placed with Father because with the

11

brief, controlled visits, she had not been able to form a good attachment with him. V.C. had also recently told the social worker that she was scared of Father. At the end of the hearing, the juvenile court concluded it would be detrimental to return V.A. to Father's care, stating that Father could only articulate vague notions about what he had learned, did not work to form an emotional attachment with V.A. during visits, had no plan to care for V.A. and simply assumed that V.C. would join V.A. so that the minors could stay together with no consideration as to how this change might impact V.C.

At the section 388 hearing, Father's domestic violence provider testified that Father completed a 52-week domestic violence class and did four additional weeks because he wanted to continue in the class. The therapist believed that Father had accepted responsibility for his inappropriate discipline of his children and for the past domestic violence in his relationships and that Father "understood the difference between his past behavior and his new tools and skills on how to be a nonviolent assertive person."

In ruling on Father's section 388 petition, the juvenile court found that other than completing the domestic violence group, Father's circumstances were not any different than they were at the 18-month review. Father challenges this finding, arguing that while his change was slow, he completed every aspect of his case plan. We will assume, without deciding, that Father adequately demonstrated changed circumstances. Nonetheless, he failed to establish that returning V.A. to his custody would be in her best interest.

12

Where as here, reunification services have ended, "the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child." (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317.) Significantly, the completion of classes is not, in and of itself, prima facie evidence that the requested modification would be in a minor's best interests. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 462-463.)

While we commend Father for his efforts to become an effective parent, the evidence was undisputed that he could not parent V.A. on his own and needed to rely on an adult daughter to help him financially and also to care for V.A. At the 18-month hearing, the social worker expressed concern that the Agency had not been able to evaluate the home of the adult daughter and that V.A. had no relationship with this person. The social worker also opined that placing V.A. with Father would be detrimental to her as it would interfere with the sibling relationship with V.C.

After observing six visits between Father and V.A., the social worked noted that Father came prepared with books, toys and snacks. She observed, however, that V.A. never showed affection toward Father and never cried after visits. The social worker opined that the relationship between Father and V.A. resembled that "of a tutor and a student who meet once a week." The CASA observed that Victoria was generally quiet and withdrawn when she was with Father and that she "perk[ed] up and [was] happiest

13

when heading to the car after the visits."  On this record, the juvenile court did not abuse its discretion when it denied Father's section 388 petition.

## II. *Beneficial Relationship Exception*

### A.  General Legal Principles

The juvenile court may terminate parental rights if there is clear and convincing evidence of adoptability.  (§ 366.26, subd. (c)(1).)  After the court determines a child is likely to be adopted, the burden shifts to the parent to show termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1)(B).  (*In re C.F.* (2011) 193 Cal.App.4th 549, 553.)  An exception to the termination of parental rights exists when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)

"The parent must do more than demonstrate 'frequent and loving contact[,]' [citation] an emotional bond with the child, or that parent and child find their visits pleasant.  [Citation.]  Instead, the parent must show that he or she occupies a 'parental role' in the child's life."  (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827.)  The parent must also show that his or her relationship with the child " 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' "  (*Ibid.*, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).)

We review the juvenile court's ruling under the substantial evidence test (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576), viewing the evidence in the light most favorable to the prevailing party (*In re J.I.* (2003) 108 Cal.App.4th 903, 911). We do not attempt to resolve conflicts in the evidence or evaluate the weight of the evidence; rather, we must draw all reasonable inferences in support of the court's findings and affirm the order even if there is substantial evidence supporting a contrary finding. (*In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610.)

B. Mother's Appeal

Mother does not challenge the juvenile court's finding that minors are adoptable. She asserts her parental rights should not have been terminated given the beneficial nature of her ongoing relationship with the minors. The Agency acknowledges that Mother had regular and frequent visitation and contact with the minors throughout most of the dependency proceedings. Nonetheless, the Agency asserts that Mother failed to show her relationship with the minors outweighed the benefits of adoption. Examining the evidence in the light most favorable to the judgment, we agree with the Agency.

Before the 18-month review hearing in February 2013, the foster mother reported that Mother rarely called to speak to the minors and was not forthcoming about wanting to see the minors more than once a week. She also expressed no interest in attending medical or educational appointments for the minors and did not inquire about V.C.'s school progress. A social worker that observed seven visits between Mother and the minors reported that Mother gave the minors physical affection, played with them, and brought them food, clothes and toys. She opined, however, that the relationship Mother

15

shared with the minors did not rise to the level of a parental role and that the relationship did not outweigh the benefits of adoption. The CASA observed that Mother "is more like a nice nanny than a parental figure. [She] is not particularly affectionate or nurturing. She does not tell the girls that she misses them or ask them about their thoughts or lives."

V.C. loved and missed Mother, and wished that she and V.A. could be returned to Mother's care. If she and V.A. could not be returned to Mother, V.C. wanted them to be adopted by their current foster mother. The CASA reported that she saw the minors once every two to three weeks, and that the minors were "transformed" in the two years that they have been in their current placement. She noted that the foster parents were hoping to adopt the minors and opined they "would make a great permanent home."

In summary, the evidence amply supported the juvenile court's conclusion that the beneficial relationship exception did not apply.

C. Father's Appeal

Father contends, and the Agency concedes, that Father regularly visited V.A. during the dependency proceeding. Father claims the juvenile court erred with it found that he failed to establish a parental bond that outweighed the right of V.A. to have permanency in a plan of adoption, arguing that substantial evidence suggested otherwise. In reviewing the juvenile court's order, however, we do not evaluate the weight of the evidence and must affirm the order even if there is substantial evidence supporting a contrary finding. (*In re Baby Boy L.*, *supra*, 24 Cal.App.4th at p. 610.)

16

In general, we agree with Father's assertions that he and V.A. had a positive and affectionate relationship. Positive interactions, however, will not overcome the adoption preference when they do not evidence that a "sufficiently significant relationship existed between [parent and child] such that termination of parental rights would be detrimental to the child." (*In re Angel B.*, *supra*, 97 Cal.App.4th at p. 468.) Here, V.A. was less than a year old when she was removed from Father and Mother's care and too young to understand that Father was her biological father. Since her removal, Father never progressed beyond weekly supervised visits. Accordingly, V.A.'s daily physical and emotional needs were met by her foster parents who are committed to adopting both minors. While it is undisputed that V.A. was happy to see Father, it is also undisputed that she separated from him easily and never cried after his visits.

Father contends that the juvenile court's finding that the beneficial relationship exception did not apply is contrary to the ruling in *In re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*), which holds that the beneficial relationship exception does not require that a parent establish that a child's primary attachment was to him or her. (*Id.* at p. 299.) While this general principle may be correct, it is important to note that the facts in S.B. are distinguishable. (See *In re C.F.*, *supra*, 193 Cal.App.4th at pp. 558-559 ["*S.B.* is confined to its extraordinary facts. It does not support the proposition a parent may establish the parent-child beneficial relationship exception by merely showing the child derives some measure of benefit from maintaining parental contact."].) Among other things, in *S.B.* the record included a bonding study by a doctor who described the bond

between father and the child as fairly strong and opined that there was potential for harm if the child lost her parental bond with the father. (*S.B.*, *supra*, 164 Cal.App.4th at pp. 295-296.) Here, the record is devoid of any evidence from a mental health provider, social worker or bonding expert that terminating parental rights so that V.A. could be adopted would cause her serious emotional or psychological detriment.

Father's reliance on *In re Brandon C.* (1999) 71 Cal.App.4th 1530 (*Brandon C.*) is similarly misplaced. In *Brandon C.*, a social services agency appealed from an order for guardianship rather than adoption based on the beneficial parental relationship exception. (*Id.* at p. 1533.) In that case, the appellate court concluded that substantial evidence supported the juvenile court's decision to find the exception applicable based on the children's emotional attachment to their mother. (*Id.* at pp. 1534-1538.) Here, substantial evidence supported the juvenile court's determination that the beneficial relationship exception did not apply and it is not our role to reweigh the evidence. (*In re Baby Boy L.*, *supra*, 24 Cal.App.4th at p. 610.)

DISPOSITION

The orders are affirmed.

McINTYRE, J.

WE CONCUR:

BENKE, Acting P. J.

AARON, J.

18